LANDRY, Judge.
Plaintiff brings this action in tort and trespass to recover damages from defendants, The State of Louisiana, Through the Department of Highways (Department) and Con-Plex, Inc. (Contractor), for alleged damages occasioned plaintiff’s turtle farm in the construction of a highway overpass by Contractor pursuant to a contract with the Department. Both defendants third partied each other. The trial court rendered judgment in favor of plaintiff against Contractor only in the sum of $26,609.00; its decree was silent as to the third party demands of defendants. Contractor has appealed praying that the judgment against it be set aside and, alternatively, praying for judgment on its third party demand. Plaintiff has appealed dismissal of its demand against the Department and is also asking for an increase in damages to the sum of $85,000.00. We affirm the judgment holding Contractor liable. We reverse the judgment releasing the Department from liability, and render judgment in favor of plaintiff in reduced amount, and against the Department and Contractor in solido. We also render judgment in favor of the Department against the Contractor on the Department’s third party demand.
Commencing in approximately 1953, plaintiff began operation of a turtle farm near Shreiver, Terrebonne Parish, Louisiana, in a 27 acre borrow pit verbally leased from Southern Pacific Railroad Company. Plaintiff’s turtle farm is situated at the northeast corner of the intersection of the railroad right of way and Louisiana Highway 20. Contractor, subject to the Department’s supervision, constructed the overpass in part upon a 116 foot right of way obtained by the Department from the railroad. The right of way traverses the turtle pond. Numerous pilings which support the overpass are located within the right of way, both within and outside the pond.
Plaintiff constructed his farm by surrounding the borrow pit and adjacent banks with a galvanized iron fence to contain his turtles. Protection of the turtles from marauding raccoons, opossums and other similar predators was accomplished by means of a single strand of energized electric wire which encompassed the fence perimeter. Two strings of electric lights were strung across the pond and burned at night to attract bugs and insects as supplemental turtle feed. Plaintiff placed several hundred cross-ties in the pond for the convenience and accommodation of the turtles. During the years 1953, 1954 and *400 1955, plaintiff stocked the pond with 55,000 turtles of the species Pseudemys Scripta Elegans, commonly known as “red eared” or “elegant slider” turtles. During subsequent years some restocking was done by plaintiff, the amount thereof being in dispute.
It is undisputed that the turtles in question spend most of their time in the water, and rarely go on land for any purpose other than egg laying. The laying season extends from March to July each year. Laying usually occurs at dusk or early morning. The females of the species proceed onto dry land for egg laying. They prefer a dry sandy, grassy bank for such purposes. In laying her eggs, the female digs a hole four to ten inches in depth, deposits her eggs therein and covers them with earth. The process takes approximately two to four hours. The species are naturally skittish and therefore easily excitable. Should the female be disturbed by noise or human activity during the laying process, she returns immediately to the water. Actual laying consumes only five per cent of the time required for the nesting process. The remainder of the time is spent in building the nest. A female actually laying eggs will not, if disturbed, return to the water. Females continually prevented by noise or human activity from laying eggs either reabsorb their eggs into their ovaries or abort the eggs into the water where they will not hatch. The most advantageous egg laying area around the pond is situated within 100 to 125 feet of the overpass.
Plaintiff gathered the eggs daily during the laying season. Incubation was achieved by placing the eggs in specially contrived containers and covering them with earth or sand until hatching occurred. Plaintiff engaged a Mr. Fonseca to incubate the eggs for a share of the live turtles produced. Plaintiff also purchased turtles from other producers. Plaintiff sold turtles to pet shops, chain stores and other similar outlets.
During the period 1960 to 1969, plaintiff obtained the following egg production:
Year No. of Eggs Laid No. of Turtles Hatched
1960 121,000 79,854
1961 170,750
1962 126,450 59,916
1963 264,775 158,064
1964 211,698 125,750
1965 262,403 142,288
1966 102,791 57,493
1967 86,435 29,248
1968 5,260 512
1969 As of June 1, duced but hatched. 300 eggs were pro-none as yet have
In 1967, plaintiff sold 84,450 turtles for $20,714.67 or 24.5 cents each. In 1968, 45,548 turtles were sold for a total of $14,916.28, or 32.7 cents apiece.
The construction contract was awarded Contractor on April 19, 1967. Work thereon commenced on or about July 5, 1967. During the fall and winter of 1966, the Department conducted surveying operations in the pond preparatory to advertising for construction bids. In the process of surveying, employees of the Department operated a paddle boat in the pond within and outside the right of way. Contractor and the Department were both aware that plaintiff conducted a turtle farm in the pond in question.
Test pilings were driven by Contractor in October, 1967, two such pilings being located in the pond itself. Pilings were driven by means of a crane and pile driver mounted on barges floated on the pond. The barges were brought to the pond on trailers. To mount a crane and other equipment on the barges, a channel approximately sixty-five feet wide and five feet deep was cut into the pond bank outside the right of way. This excavation was never refilled. Large concrete pilings were stacked on the bank of the pond outside the right of way. Barges were operated by Contractor in the pond both within and without the right of way. A motorboat operated by Contractor in the pond resulted in the death of thirty to forty tur *401 ties who were killed by the boat’s propeller. While the bank excavation was open, an unusually heavy rain caused adjacent Bayou Terrebonne to overflow with the result that a large number of turtles escaped from the pond. After the pilings were driven by Contractor, it was necessary to break approximately fifteen inches from the top of each piling. This was done with air hammers. Large chunks of concrete thusly broken off fell into the pond. Plywood forms used in the construction process were allowed to float across virtually the entire surface of the pond. The bank of the pond was removed for a distance of approximately 30 feet within the right of way. Construction activities resulted in destruction of the lighting system and the electric protection wire. The fence in the excavation area was destroyed.
In essence plaintiff testified he rented the pit pursuant to an oral lease, and began his operation approximately 8 to 12 years prior to commencement of construction. He maintained that activities in the pond by the Department and Contractor were detrimental to his endeavor. Despite his protests, no steps were taken to protect the turtles or minimize the disturbance resulting from construction activities. He first noted a decline in egg production in 1966 when the Department’s survey crew operated a boat in the pond. The only response to his complaints was that the Department ceased using a motor boat in the performance of its work. In addition to his originally stocking the pond with about 55,000 turtles, he annually added about 1,000 to 1,200 turtles which he purchased in small lots, sometimes as little as 15 to 20 turtles. His testimony indicates that he purchased whatever turtles were brought to or offered him, whether large or small, and without regard to sex. His testimony further indicates he has practically no knowledge concerning the reproductive span of the turtles involved, and leaves serious doubt concerning his ability to distinguish younger turtles by sex.
Plaintiff stated that his lighting system, including a pole containing his meter and switches, was destroyed along with the rest of his lighting system. His fence was removed or damaged, requiring restoration. Some corners of the fence which were rounded to prevent turtles from piling up in the corner, were reconstructed by the Contractor at right angles. Plaintiff was required to remedy this condition. He also stated he replaced approximately 50 fence posts at a cost of 65 cents each, and spent approximately $35.00 for labor to replace the posts. He expended the further sum of about $25.00 in filling the hole cut in the embankment to level the ground so that he could cut the grass in that area. He further observed that after the work started, he noted that his turtles were commencing to turn brown. He expressed the opinion that the Department first began operations in the pond in the latter part of 1966. He could not account for the large variation in egg production during the year 1966 and prior years.
^Plaintiff’s wife testified in effect that she kept books for the turtle farm. She produced records which established that during the period 1959 to 1968, 27,690 turtles were added to the pond for restocking. Of this number, 2,652 were added in 1959, 3,444 in 1961, 5,200 in 1962, 5,649 in 1965, 5,669 in 1966, 1,963 in 1967, and 3,113 in 1968. Plaintiff’s production and hatching figures were confirmed in general by the testimony of Douglas J. Fonseca who hatched eggs for plaintiff on shares. Mr. Fonseca also corroborated plaintiff’s testimony and that of Mrs. Bergeron regarding annual restocking.
Plaintiff’s accountant, Ernie Joseph Porche, testified that he prepares plaintiff’s annual income tax returns. He noted that the average number of eggs laid in 1963, 1964 and 1965 was 246,272, of which number an average of 57.67%, or 142,033 hatched. Since only 57,493 turtles were produced in 1966, Porche estimated plaintiff’s loss for that year was 84,540 turtles at 16.67 cents each, or $14,097.65. Mr. *402 Porche also showed that plaintiff’s annual operating expenses were as follows: In 1963, $3,927.70; 1964, $3,811.80; 1965, $3,581.05; 1966, $1,609.02; 1967, $324.50, and 1968, $164.72.
Dr. Curt D. Rose, aquatic ecologist, described the nature and habits of red eared turtles as hereinabove set forth. He conceded that little knowledge is possessed regarding the span of sexual activity of the male of the species. He would not speculate on how long a male is capable of fertilization. He stated that the older males take on a dark type of appearance which might be an indication of sexual impotency. He conceded that the only certain way to determine potency of a male turtle is by dissection of its testes. He acknowledged that he did not undertake such a procedure. He added that from visual observation, he did not detect a significant number of brown male turtles. Dr. Rose explained that as regards female turtles, slightly more knowledge is available. Female production commences about the third year and ceases in about the fifteenth year when the turtle attains a ventral shell size of 8Vz to 9 inches. He did not find a large number of 8 or 9 inch turtles in the pond. Dr. Rose dissected eight female turtles selected at random from the pond and brought to him by plaintiff. He found all capable of producing eggs, but conceded that it was not a representative sampling from which the determination could be made that the average composition of females could reproduce. Dr. Rose noted that male fertilization suffices the female for about three or four years. He estimated that 10% of the turtles were too old to reproduce and a like percentage too young. Water tests disclosed an absence of pollutants or other conditions known to be unfavorable to breeding. Examination of the pond bank disdosed the best egg laying site was in the vicinity of the overpass where the greatest noise and activity occurred. Dr. Rose found, however, that other areas of the bank were suitable for egg laying. Dr. Rose acknowledged that heavy initial pond stocking, followed by a decrease in annual stocking, would tend to lead to the conclusion that sexual senility was responsible, at least in part, for the noted decline in egg production. Dr. Rose further observed that the effects of stocking and restocking would depend upon the ages of the turtles as they were introduced into the pond. He observed that turtles five or six years old, placed in the pond in the 1950’s, would have passed their peak production by 1966. Dr. Rose could not state with any degree of assurance that the decline in egg production was due mainly to the construction activity. He theorized, in effect, that the disturbance attending construction could have contributed to the decline, but could not with any degree of certainty say to what extent or that the disturbance was the sole cause.
Mr. Heriberto Rivera, the Department’s Assistant Project Engineer for the overpass, acknowledged he was aware of plaintiff’s operation of a turtle farm within the right of way before construction began. He cautioned the Contractor to remain within the right of way. He was also aware that on numerous occasions work was performed outside the right of way area. In general, his testimony was to the effect that Contractor performed his work in an acceptable fashion. Rivera also stated that the method employed by the contractor in driving piling, breaking piling tops and removing plywood forms was accomplished in the usual manner. He explained that it was virtually impossible to keep the chunks of concrete broken from the pilings from falling into the pond. He acknowledged that before construction commenced, the Department operated a boat in the pond both in and out of the right of way area.
Contractor’s General Superintendent, Charles R. Webster, stated he was aware of the turtle farm operation. He acknowledged that a state employee told him that noise affected the turtles adversely. He instructed his crew to cooperate with plaintiff. Before construction began, he was *403 aware that the work would require activity outside the right of way area. He had his underling, Menikheim, secure permission from the railroad’s agent to utilize property outside the right of way limits. He noted that because of delays in receiving materials, work did not commence until February, 1968, rather than August, 1967, as originally scheduled. He also explained that three methods were available by which the required work could be performed. A false bridge could be employed, earthen material could be used, or barges could be engaged. The latter method was selected as it would cause the least disturbance in the pond. Using barges, however, required cutting the pond bank to admit the barges. Ten barges measuring 10 feet by 40 feet by 5 feet were utilized. They often were maneuvered outside the right of way. A total of 77 piles were driven in the pond, the work being completed in the spring of 1968. When plaintiff complained of a motorboat operating in the pond and of lumber being stacked outside the right of way, Webster ordered use of the boat stopped and removal of the lumber. Webster observed a non-continuous rusty electrical wire surrounding the pond before construction began.
In substance, Harvey Allen Menikheim, Contractor’s pile driver foreman, corroborated Webster’s testimony that the right of way was too narrow, and that permission was obtained from an employee of the railroad to use the land beyond the right of way. Menikheim informed plaintiff it would be necessary to take down part of the fence to admit equipment to the right of way. He stated that plaintiff consented to such procedure after saying it made no difference because plaintiff was going to sue the Department and Con-Plex anyway. Menikheim further stated the bottom of the pond was dredged with a dragline to accommodate the work barges in an area where the pond was too shallow. Approximately 200 cubic yards were excavated, an undetermined amount of which was dropped back into the pond. Menikheim also acknowledged that materials and equipment were placed outside the right of way. He stated, however, that insofar as possible, all work was done so as not to injure plaintiff’s turtles.
Following the flood rain that caused Bayou Terrebonne to overflow, Contractor assigned its employee, Clarence Jackson, and several co-workers, to assist plaintiff in restoring the fence in an area where it washed out.
Willie Baker, superintendent for Dixie Contractors, testified that his firm contracted to do earth moving work on the project. He observed that at time of trial, work was in progress 400 feet from the south end of the pond, and also at a point between 150 and 200 feet from the north end of the pond. He also stated that earth moving equipment had operated near the pond for a year prior to trial, and that equipment will continue to operate in the area for an indefinite time.
The trial court found that Contractor conducted numerous activities outside the right of way, and that such activities contributed, at least in part, to the decline in egg production. The lower court also held that such diminution in production as resulted from properly conducted work within the right of way area were damages which plaintiff could not recover. Predicated on Dr. Rose’s testimony, the trial court concluded that sexual senility was not the cause of the decline in turtle reproduction. The trial court’s reasons for judgment do not explain the basis on which the award of $26,609.00 was determined.
Following oral argument herein, and before rendition of our opinion, the Supreme Court handed down its decision in Chaney v. Travelers Insurance Company, et al., 259 La. 1, 249 So.2d 181, reported July 15, 1971. Being of the opinion that Chaney, above, might be pertinent to the instant case, we ex proprio motu ordered reargument of this matter to afford coun *404 sel for all concerned an opportunity to discuss the possible pertinency of Chaney, above. Upon further reflection, however, we deem Chaney, above, to be inapplicable. For the reasons hereinafter set forth, we conclude the present matter does not fall within the ambit of LSA-C.C. art. 667, but is, as characterized by plaintiff, an action in tort brought by a lessee under our general tort law, LSA-C.C. art. 2315, pursuant to the authority contained in LSA-C.C. art. 2703.
The Department and Contractor urge that a lessee has no right to bring an action in his own right to recover for a trespass upon the leased premises. They also urge that this rule is especially applicable where, as in the present case, the lease is unrecorded. It suffices to say that the above cited and well recognized rules are inapplicable because of the nature of the claim asserted herein.
Plaintiff clearly brings this action predicated upon the terms of LSA-C.C. art. 2703, which provides as follows:
“The lessor is not bound to guarantee the lessee against disturbances caused by persons not claiming any right to the premises; but in that case the lessee has a right of action for damages sustained against the person occasioning such disturbance.”
Our Supreme Court has interpreted Article 2703, above, to mean that a lessee in possession of the leased property is a “quasi owner” with the right to legally use the property. As such, he has the authority to institute in his own name an action for damages against a third party who causes the lessee loss or injury. Esmele v. Violet Trapping Co., 187 La. 728, 175 So. 471. In Esmele, above, the holder of a trapping lease on a large tract of land was held entitled, pursuant to Article 2703, above, to seek damages from third parties also engaged in trapping on the leased premises. We note that the opinion on Es-mele, above, does not indicate whether the lease was verbal or written, recorded or unrecorded.
We think it matters not whether a lessee suing pursuant to LSA-C.C. art. 2703, sues upon a lease written or oral, recorded or unrecorded. In all such instances, the lessee seeking recovery against a third party claiming no interest in the property adverse to the owner or lessee may not look to his lessor for redress. The sole remedy available to the lessee is an action in his own name to recover the damages. We believe the reason for the rule is obvious. It would impose a most onerous burden upon a lessor to require that he defend his tenant against the tor-tious actions of third parties claiming no interest in the property. The obligation of the lessor is to insure lessee peaceable possession, free from the claims of other parties asserting rights in the property adverse to those of the owner or in conflict with the lease rights of the lessee, depending upon the nature of the lease.
Contractor maintains the trial court erred in holding Contractor negligent in any respect whatsoever, and also in holding that plaintiff stated a cause of action. Contractor further argues the trial court erred in awarding damages notwithstanding plaintiff’s failure to establish actual damages as required by law. Contractor also contends that the evidence shows it is as equally probable that the decline in production resulted from sexual senility as that it occurred from human activity in the pond. On this premise, it is argued that plaintiff has failed to sufficiently prove his case. Contractor next maintains that if it be found that the decline in production resulted from construction activity, the mere construction of the overpass, whether negligently conducted or not with respect to the turtle operation, would have caused the decrease in production. Therefore, Contractor contends any negligence on its part was not a cause in fact of plaintiff’s damages, because the damage would have resulted if the work had been performed in a *405 non-negligent manner. The next contention of Contractor is that plaintiff has no right of recovery because his lease is unrecorded, and also because plaintiff failed to minimize his damages by securing an injunction barring construction. Contractor also contends plaintiff suffered a mere temporary inconvenience which is damnum absque injuria, especially because the construction project advanced the public good. Lastly, Contractor argues that liability, if any, must attach to the Department for failure to provide an adequate right of way for the project, and alternatively, that the Department be held liable in solido to plaintiff.
The Department denies any negligence on its part and makes substantially the same contentions as Contractor. Alternatively, the Department seeks to hold Contractor liable in solido.
Considering the question of defendants’ liability, we find the record establishes defendants’ fault and wrongdoing sufficiently to justify plaintiff’s recovery in tort. The record shows that both the Department and Contractor were aware of plaintiff’s verbal lease from the very beginning. We add that oral permission obtained by defendants from the property owner to use owner’s property outside the right of way does not relieve defendants of the obligation to make restitution for the damage wrought. De Moss v. Police Jury of Bossier Parish, 167 La. 83, 118 So. 700.
We find that the use made of the property by defendants amounted to a virtual appropriation of such portions of plaintiff’s turtle farm outside the right of way limits as defendants deemed advisable to the successful completion of the overpass project. It is clear that defendants used property adjoining the right of way as best suited defendants’ needs and purposes. Boats were used in the pit outside the right of way when and where it was found desirable. Barges were brought into the pit and moored outside the right of way limits. Plywood forms were allowed to accumulate and virtually cover the borrow pit in areas outside the right of way limits. A slip approximately three feet deep and sixty-five feet wide to accommodate barges was dug into the bank outside the right of way and left unfilled, A considerable portion of the retaining fence was destroyed outside the right of way. Practically all of plaintiff’s lighting system, including his meter and switches located outside the right of way, was destroyed. The electric fence designed to discourage predators was in the main ruined. Gaps were left in the retaining fence. An undisclosed number of mature turtles were lost when they escaped through the bank cut made by Contractor and left unfilled. While it appears defendant Contractor at times took measures to prevent or minimize plaintiff’s loss, such efforts were not successful.
The difficulty herein lies in the assessment of damages. Plaintiff testified his lighting system was worth approximately $500.00, and the electric fence about $45.00. Plaintiff also testified that he replaced about 50 fence posts costing 65 cents each, and incurred about $30.00 in labor costs with regard to this item. Plaintiff further testified he incurred about $25.00 expense in attempting to fill the gap in the bank to level the ground so that he could mow the grass in that area.
It is clear that plaintiff lost an undetermined, but rather a large number of mature turtles, the value of which is not shown with any great degree of certainty.
The record establishes to a reasonable certainty that the productivity of the turtles was adversely affected by the activities conducted by defendants. The record does not show, however, the extent of such effect. The only testimony on this crucial issue is that of Dr. Rose. We readily deduce that the witness could not attribute all of the loss to construction activities. At best, we find Dr. Rose’s testimony establishes that some of the diminution in production resulted from the project. In this connection, we deem it significant that a *406 better than 50% reduction in eggs produced occurred in 1966 as compared to 1965. This notable decrease in production antedated defendants’ activities which first commenced by the Department in the fall of 1966, after the laying season for that year. We likewise note that an almost 20% reduction occurred in 1967, prior to commencement of actual construction work. Based on Dr. Rose’s testimony and the history of the pond as related by plaintiff, we conclude that this salient decrease in production was due to considerable extent from the aging of the turtles.
It is settled law that where damages are not readily susceptible of exact proof, reasonable discretion is allowed the courts in assessing damages under the facts and circumstances peculiar to each case. Duhon v. Cormier, La.App., 186 So.2d 645; Hayward v. Carraway, La.App., 180 So.2d 758.
Under the circumstances attending this case, we find that the sum of $26,609.00 allotted plaintiff by the trial court greatly exceeds the amount which can be granted pursuant to the reasonable discretion vested in the Courts. We think an award of ■$10,609.00 is indicated under the facts of this case, and reduce the judgment accordingly. Ballard v. National Indemnity Company of Omaha, Nebraska, 246 La. 963, 169 So.2d 64.
The contract between the Department and Contractor obligates Contractor to make good the claims of all third persons damaged by the negligence of the Contractor in the performance of the work.
Plaintiff is entitled to judgment against the Department and Contractor in solido. Chaney v. The Travelers Insurance Company, 259 La. 1, 249 So.2d 181.
The contract between the Department and Contractor obligates the latter to hold the former harmless against the claims of all third persons arising from the Contractor’s negligence. The Department is entitled to judgment against the Contractor on its third party demand. Chaney, above.
It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Earl P. Bergeron, and against defendants, The State of Louisiana, Through the Department of Highways and Con-Plex, Inc., in solido, in the sum of $10,609.00, together with legal interest thereon from date of judicial demand, until paid.
It is further ordered, adjudged and decreed that there be judgment herein in favor of the State of Louisiana, Through the Department of Highways, on its third party demand, against defendant Con-Plex, Inc., in the sum of $10,609.00, together with interest thereon from date of judicial demand, until paid; all costs of these proceedings to be paid by defendant, Con-Plex, Inc.
Affirmed in part, reversed in part, amended and rendered.