346 So.2d 1365 (1977)
Edward G. JARDELL, Plaintiff and Appellee,
v.
SABINE IRRIGATION COMPANY, INC., Defendant and Appellant.
No. 5915.
Court of Appeal of Louisiana, Third Circuit.
May 13, 1977.
Rehearing Denied June 24, 1977.
*1366 Jones, Patin, Harper, Tete & Wetherill by Carl H. Hanchey, Lake Charles, for defendant-appellant.
Cox, Cox & Knapp by Leonard K. Knapp, Lake Charles, for plaintiff-appellee.
Before HOOD, CULPEPPER and STOKER, JJ.
CULPEPPER, Judge.
The plaintiff, a farm lessee, asserts the following causes of action against defendant, an irrigation company with canals servicing the property leased by plaintiff: (1) An action for damages sustained as a result of defendant's alleged breach of a contract to supply plaintiff with water in sufficient quantities to properly irrigate his rice crop in 1974. (2) An action in tort for damages to plaintiff's soybean crops in 1974 and 1975, allegedly caused when water from defendant's canals flooded portions of plaintiff's soybean crops. The leakage from the canals was allegedly caused by defendant's negligence in maintaining, operating and inspecting the canal system. (3) An action to recover bonus or incentive payments under the terms of an incentive program begun by defendant in 1967 and allegedly never discontinued.
*1367 The trial court rendered judgment in plaintiff's favor awarding (1) damages for breach of the contract to supply water; (2) damages in tort for flood damage to the soybean crops in 1974 and 1975; (3) sums due under the incentive program for the years 1973, 1974 and 1975. The total amount of the damage award is $23,852.47. Defendant appealed. Plaintiff answered the appeal, seeking an increase in the award.
Defendant's five assignments of error raise the following issues: (1) Are the laws of registry, LSA-R.S. 9:2721 and 2722, applicable to the present case? (2) Are the owners of the land leased by plaintiff indispensable parties to this action? (3) Did the trial court err in concluding that defendant's negligence or improper maintenance of the canal system caused the escape of water from the canal onto a portion of plaintiff's soybean crops, resulting in damages? (4) Assuming plaintiff is liable to defendant in tort, did the trial court employ an appropriate method of calculating crop damages? (5) Did the trial court err in awarding damages for mental anguish associated with the tortuous damage to plaintiff's soybean crops? (6) Did the trial court err in holding defendant breached his contractual obligation to supply sufficient water for plaintiff's rice irrigation needs in 1974? (7) Assuming defendant breached his irrigation contract, did the trial court employ an acceptable method in calculating crop damage? (8) Did the trial court err in holding that the incentive program continued in force through 1975, thus obligating defendant to pay plaintiff rebates for the years 1973, 1974 and 1975?

GENERAL FACTS
Defendant, Sabine Irrigation Company, or its predecessors (Sabine) began operating a farm irrigation system in the area near Vinton, Louisiana in about the year 1900. The system consists of a main canal from the Sabine River and many miles of "laterals" or branches extending into the various fields. Water is pumped from the river into the canal. The canal operates primarily on a gravity flow principle. The water in the canals and laterals is above normal ground level and is confined by levees and a series of gates and other structures which can be opened in order to flood the fields. The irrigation system, including the water gates through which water flows onto the fields, is maintained and operated by Sabine.
There are no written contracts between the farmers and Sabine. However, it is mutually understood and agreed each year that Sabine receives one-fifth of the proceeds from the sale of rice crops in return for furnishing the farmers with the water necessary to grow a healthy rice crop. Before the growing season begins, employees of the canal company ask the farmers how many acres of rice they intend to plant in order to make preparations for the forthcoming growing season. During the growing season, the farmers inform the canal company of their specific water needs within a few days of the day water will actually be needed. Usually, employees of the canal company operate the water gates to control the flow of water from the main canal into laterals servicing the various fields.
Ample quantities of irrigation water at the proper time are essential to rice cultivation. The fields must be flooded at several stages during the growth cycle. In addition to nourishing the plants, the irrigation water covering the fields prevents growth of grass and is necessary for application of certain fertilizers, herbicides and other chemicals. Time is a critical factor in rice irrigation. If the fields are flooded too slowly or at the wrong time, damage to the rice crop results and yields are reduced.
The plaintiff, Edward Jardell, had farmed in the Vinton area for many years on land irrigated by the defendant's canal system. During 1974 and 1975, the time pertinent to this suit, plaintiff was the lessee of four separate tracts of land referred to in the record as the "Miller Farm", the "Jardell Estate Farm", the "Granger Farm", and the "Cormier Farm". All of the leases were oral except that for the Jardell Estate Farm. It was written and *1368 recorded. On the Miller Farm, the land rent was set at one-fifth of the crops grown thereon. On the three remaining farms, land rent was set at one-sixth of the crops.
During 1974 and 1975, Jardell grew rice and soybeans on the previously mentioned farms. The record shows that despite his repeated requests during 1974 that Sabine supply him with water necessary for irrigation of his rice, sufficient water was never made available. On July 1, 1974, Jardell made a written demand on the canal company in an effort to secure sufficient water for irrigation. Even after the written demand, Jardell was unable to obtain sufficient water for irrigation.
The evidence shows that Sabine maintained a water level in the main canal that was too low to provide plaintiff with the water he needed to irrigate his crops. As a result, certain portions of his rice crops were insufficiently watered. The yields (in barrels of rice per acre) were substantially lower on the portions of the fields which were inadequately irrigated than yields from the portions of the fields which were adequately watered.
Damages to plaintiff's soybean crops occurred in 1974 and 1975 when water escaped from the canal and inundated portions of the fields. The evidence is sufficient to support the finding of fact by the trial judge that plaintiff's crops were damaged as a result of the inaction of defendant in not properly maintaining its canal system. A dragline essential to preventive maintenance "in the off-season", and for general maintenance at other times, remained for several months in a repair shop, in operating condition, awaiting payment of the repair bill by the canal company. Sabine employed too few "canal walkers" or inspectors to properly monitor the canal system. Finally, there was abundant testimony to the effect that in recent years Sabine drastically curtailed its maintenance operations.
After the close of plaintiff's case, defendant presented no evidence in its defense, taking the position that plaintiff had proved no damages to either his rice or soybean crops.

APPLICABILITY OF THE REGISTRY LAWS
Citing LSA-R.S. 9:2721 and 2722, defendant argues that it is a third party entitled to rely on the laws of registry, that plaintiff's unrecorded oral leases can have no effect against defendant, and that plaintiff therefore cannot sue defendant for damages to standing crops, which must be considered as part of the land owned by the owners of the land.
The registry laws are inapplicable to the present case because this is an action between the parties to a contract for breach of a personal obligation under the contract. The canal company contracted directly with plaintiff to furnish him water for irrigation of his rice crops in return for one-fifth of the crop. Therefore, the trial court did not err in refusing to sustain the exception of no right of action on the grounds that three of the four leases were not recorded in the public records.

FAILURE TO JOIN INDISPENSABLE PARTIES
LSA-C.C.P. Article 641 provides:
"Indispensable parties to an action are those whose interest in the subject matter are so interrelated, and would be so directly affected by the judgment, that a complete and equitable adjudication of the controversy cannot be made unless they are joined in the action."
Defendant argues that the landowners-lessors are indispensable parties. We do not agree.
LSA-R.S. 9:3204 declares:
"In a lease of land for part of the crop, that part which the lessor is to receive is considered at all times the property of the lessor."
Although under this statute the lessor-landowners own the portion of plaintiff's crops designated as rent, the landowners are not indispensable parties. They are instead, "necessary parties" under the terms *1369 of LSA-C.C.P. Article 642, because their interests in the subject matter are separable [see Yiannopoulos, La. Civil Law TreatiseProperty, Vol. 2, Section 44.5, pages 47-48 (1977 p. p.)] and are not directly affected by the judgment.
Failure to join necessary parties is a dilatory exception which must be filed before answer or judgment by default. LSA-C.C.P. Articles 926(8), 928. Since defendant failed to timely file the exception, it waived its right to compel joinder of the landowners. LSA-C.C.P. Article 926.
In oral argument before this Court, plaintiff abandoned any claim for damages to the portion of the crop which is owned by the landowners. Furthermore, in calculating damages the trial court allowed defendant a credit equal to the portion of the crop designated as rent for the landowners. Thus, the interests of the lessor-landowners are not affected by or involved in this litigation.

RECOVERY IN TORT FOR DAMAGES TO SOYBEAN CROPS
Having concluded the registry laws are inapplicable and the landowner-lessors are not indispensable parties, we now address plaintiff's tort claim for damages to his soybean crops in 1974 and 1975. It is now well settled that the predial lessee owns growing crops as movables by anticipation. See Yiannopoulos, La. Civil Law TreatiseProperty, Section 44.5 (1975 p. p.) and cases cited in Footnotes 44.42 and 44.43 therein. Our courts have often recognized the right of the predial lessee, under Article 2315 of our Civil Code, to recover from those who cause damage to his growing crops or other property. See, for example, Watkins v. Gulf Refining Company, 206 La. 942, 20 So.2d 273 (1944); Trahan v. Florida Gas Transmission Company, 208 So.2d 550 (La.App. 3rd Cir. 1968). In addition, under the terms of Article 2703 of our Civil Code, the lessee has a right of action against any person not claiming a right to the premises for damages caused by disturbance of the lessee's use or enjoyment of the leased premises, regardless of whether the lease is recorded. Bergeron v. Con-Plex, Inc., 255 So.2d 397 (La.App. 1st Cir. 1971); Cane River Needle Art v. Reon, Inc., 335 So.2d 751 (La.App. 3rd Cir. 1976), writ refused, no error of law, La., 339 So.2d 15. Thus, plaintiff has a right of action and a cause of action against defendant for damages to his soybean crops caused by leakage of water from defendant's canals, where defendant had no right to allow water to leak from its canals onto the soybean fields.
The trial court found as a matter of fact that the damages to plaintiff's soybean crops were caused by defendant's negligent maintenance of the canal system. We affirm this factual determination, because it is supported by a reasonable evidentiary basis.
Defendant argues that it is implicit in the holdings in Andrepont v. Acadia Drilling Company, 255 La. 347, 231 So.2d 347 (1969) and Hargroder v. Columbia Gulf Transmission Company, 290 So.2d 874 (La.S. Ct.1974) that a lessee under an unrecorded lease cannot recover in tort against third persons who cause damage to his standing crops. In both cases, farm lessees with unrecorded leases sued for damages to their growing crops caused by persons who had acquired real rights in the leasehold property. In Andrepont, the defendant was a mineral lessee who damaged plaintiff's crops in the course of its oil and gas exploration and production. In Hargroder, the defendant grantee of a pipeline servitude damaged plaintiff's crops during the construction of its pipeline.
In its original hearing in Andrepont, the Supreme Court followed the holding of the Court of Appeal that since plaintiff's farm lease was verbal and unrecorded, he could not assert his separate ownership of the standing crops against the defendants, since they were third persons relying on the law of registry, LSA-R.S. 9:2721, and defendant had a right to be on the premises and to damage the crop. On rehearing, the Supreme Court reversed and allowed the plaintiff farm lessee to recover on the basis that defendant's mineral lease contained a *1370 stipulation pour autre agreeing to pay all damages to standing crops, including those of a lessee under an unrecorded farm lease. In the subsequent Hargroder case, the Supreme Court followed the same rationale, basing its decision in favor of the farm lessee on the basis of a stipulation pour autre in the servitude agreement.
Defendant in the present case argues that since the Supreme Court decided the Andrepont and Hargroder cases on the basis of stipulations pour autre contained in the agreements under which defendants were on the premises, it is implicit that in the absence of these stipulations pour autre contained in these instruments, the court would have held that the lessees under unrecorded farm leases could not recover against third parties for damages to growing crops.
The Andrepont and Hargroder cases are readily distinguished from the present matter. The defendant in Andrepont and Hargroder had a right, acquired from the landowner, to go onto the premises and to cause the damages to the crops. This was obviously the problem which caused the Supreme Court on rehearing in Andrepont to use the stipulation pour autre as the basis for holding in favor of the tenant farmer. In the present case, the defendant irrigation company had no right acquired from the landowners to allow water to leak from its canals and flood the soybean fields of the plaintiff farmer.
A reading of LSA-C.C. Article 2703 shows that it takes cognizance of this distinction between a situation where the third person has a right to be on the premises and a situation where he does not. The article reads:
"The lessor is not bound to guarantee the lessee against disturbances caused by persons not claiming any right to the premises; but in that case the lessee has a right of action for damages sustained against the person occasioning such disturbance." (Emphasis supplied)
In Bergeron v. Con-Plex, Inc., 255 So.2d 397 (La.App. 1st Cir. 1971), the court recognized this distinction in holding that a lessee under an unrecorded lease of a borrow pit, used as a turtle farm, could recover against a highway contractor who damaged plaintiff's turtle farming operation. The court noted that the leased premises were outside the highway servitude, and the defendant contractor had no right to be on the leased premises. The opinion states that in this situation the lessee can sue under LSA-C.C. Article 2315, our general tort law, pursuant to the authority granted to lessees under LSA-C.C. Article 2703.

AMOUNT OF DAMAGES IN TORT TO SOYBEAN CROPS
In both 1974 and 1975, plaintiff grew his soybean crops on the Miller Farm, planting 109.4 acres each year. In 1974, water from the canal flooded and destroyed 6.5 acres of the crop. 102.9 acres of the crop remained undamaged and yielded 26.84 bushels of soybeans per acre. The selling price of the soybeans was $6 per bushel.
In calculating damages, the trial court simply multiplied the number of acres lost due to flooding (6.5) by the number of bushels per acre produced on the undamaged portion of the field (26.84). This multiplication resulted in 174.46 bushels, an estimate of the yield which plaintiff would have gotten from the 6.5 acres if they had not been flooded and destroyed. The court then multiplied the figure of 174.46 bushels by the selling price ($6 per bushel) to arrive at a total damage figure of $1,045.80. From this amount, the court deducted $174.23 as the landowner's one-sixth interest in the crop.[1] Damages of $870.57 were awarded for loss of the 6½ acres of the soybean crop in 1974.
In 1975, 19.5 acres of soybeans were lost due to flooding. Employing the same method as in 1974, the trial court calculated losses to be $2,256.47. As plaintiff points *1371 out in his brief before this Court, however, a $10 mathematical error was made in subtracting the land rent ($449.08) from the total damages ($2,695.55). Thus, the correct loss figure for 1975 is $2,246.47 rather than $2,256.47.
The method employed by the trial court in calculating crop damages is substantially the same as one approved by this Court in Williams v. Trunkline Gas Corporation, 149 So.2d 160 (La.App. 3rd Cir. 1963), and is consistent with the formula employed in Bryant v. McCann, 297 So.2d 262 (La.App. 3rd Cir. 1974) and Trahan v. Florida Gas Transmission Company, 208 So.2d 550 (La. App. 3rd Cir. 1958). Consequently, we find no error in the trial judge's calculation of damages to the soybean crops.
In tort actions, damages may be awarded for inconvenience, mental anguish, and worry occasioned by injury to one's property. Trahan v. Florida Gas Transmission Company, supra, and cases cited therein. The trial judge awarded plaintiffs $1,000 as compensation for inconvenience and problems in trying to grow his soybean crop in 1974 and awarded the same amount for the 1975 crop year. It is clear from the record that defendant was troubled and inconvenienced by the leakage of the canal. The damage award of $1,000 per year seems more than adequate, but it is within the broad discretion afforded the trial judge in fixing the amount of damages.
As modified by the correction of the mathematical error, we affirm the judgment of the trial court granting plaintiff a total of $5,117.04 for soybean crop damages and inconvenience caused by defendant's negligent maintenance of the canal system.

BREACH OF CONTRACT TO SUPPLY IRRIGATION WATER
Defendant admits it entered into a verbal agreement with plaintiff to supply water for irrigation of his rice crops. The evidence supports the trial court's finding that the primary purpose of the contract between plaintiff and defendant was to furnish plaintiff with an adequate supply of water when he needed it in order to grow a good crop of rice. The trial court concluded that in 1974 and 1975 defendant breached its irrigation contract with plaintiff by failing to provide plaintiff with sufficient water to properly grow his rice crops. This finding of fact is amply supported by the testimony of several farmers, including plaintiff, who are serviced by the canal. These farmers saw the damage to plaintiff's rice crops and attributed it to lack of water at crucial stages of growth. Further support for this conclusion is provided by the testimony of Allen L. Cox, an agricultural and civil engineer, who was qualified as an expert in the field of soil and water engineering.
After studying the canal system, Cox concluded the water level of the canal was too low to flood plaintiff's fields at the rate required for proper irrigation. He attributed the inadequacy of the canal system to lack of preventive maintenance and noted there were signs indicating the water level in the main canal was six to eight inches lower than it had been for extensive periods in the past. The evidence indicates that a drop of only a few inches in the level of the main canal can result in disastrous consequences for crop irrigation.
Clearly, there is a reasonable evidentiary basis for the trial court's conclusion that the irrigation contract was breached and damages to plaintiff's rice crops resulted.
Defendant does not seriously contest the trial court's finding that it breached its obligation to supply plaintiff with sufficient quantities of water for proper irrigation. Instead, defendant takes the position that no damages were proved. We think plaintiff proved damages to his rice crops, and the trial court calculated the amounts of damages by an acceptable method. The amount of damages to the rice crops is the subject of the following section of this opinion.

AMOUNT OF DAMAGES TO RICE CROPS
In calculating damages to the rice crops on each of the four farms leased by *1372 plaintiff, the trial court employed the same formula we approved in Williams v. Trunkline Gas Company, supra. All of the rice was planted at the same time and received the same care. The damaged areas of each rice field were harvested separate from the undamaged portion. The yield (in barrels of rice per acre) was calculated separately for the damaged and undamaged portions of the field. The yield on the damaged fields was subtracted from the yield on the properly watered portions of the fields. The result was the reduction in yield attributable to the lack of water. In order to arrive at the total number of barrels of rice by which the harvest was reduced by the water problems, the reduction in yield per acre was multiplied by the number of acres suffering from lack of water. When this figure was obtained, it was multiplied by the price per barrel obtained for the undamaged rice to arrive at the total pecuniary loss attributable to lack of proper irrigation. From this amount, the trial court deducted the landowner's rental portion (1/5 or 1/6) and the "water rent" due to Sabine (1/5). The remainder was awarded to plaintiff as damages to his portion of the crops.
The only deviation from the formula approved by us in Williams occurred in calculations for damages to rice on the Jardell Estate. On the Jardell Estate, there was no undamaged acreage. The entire crop suffered from lack of water. Since there was no undamaged acreage to compare to the damaged acreage, the trial judge averaged the yields per acre on the undamaged portions of the Granger and Miller Farms for use as a standard. This amount, 27.64 barrels per acre, was compared to the actual yield per acre of 20.03 to calculate damages on the Jardell Estate. We think this is a reasonable deviation from the Williams formula. The trial court has broad discretion in selecting a method of calculating damage to crops.
We affirm the trial court's award of the following amounts (as amended by correction of mathematical errors) for damages to plaintiff's rice crops in 1974: Miller Farm $5,469.96; Granger Farm$4,211.55; Jardell Estate$4,144.28; Cormier Farm $2,704.33.
Defendant argues that no damages can be awarded because Jardell was significantly above the production of the over-all canal system, and his production in past years had not attained the level for which damages were awarded. However, there was no evidence presented as to whether the figures submitted by Sabine for other farmers on the system were crops of the same kind, planted in the same manner, and cared for in the same manner. Furthermore, the record establishes that Jardell was an above average farmer in terms of production. Therefore, the average yield of the other farmers on the system is not the best measure for calculating damages to Jardell's rice crops.
As a part of damages for breach of contract, the trial court awarded plaintiff $500 for the extra work caused by the rice irrigation problems. There is sufficient evidence in the record to support this award. As a result of defendant's failure to properly maintain levees, plaintiff was forced to use his own labor for maintenance. In addition, more labor was necessary to check the erratic water supply. Plaintiff incurred further additional expenses from the increased use of his equipment and horses in the maintenance and inspection of the canal system. These additional expenses resulted in a loss of profits. Awards for loss of profits resulting from breach of contract are specifically authorized by Article 1934 of the Civil Code. Therefore, we affirm the judgment of the trial court awarding $500 to compensate plaintiff for increased expenses associated with the breach of the irrigation contract.

THE INCENTIVE PROGRAM
After negotiations with a number of farmers on the canal system, the company instituted an incentive program to encourage better farming methods to increase rice yields. The terms and purpose of the incentive program are stated in a letter dated March 1, 1968 from the manager of Sabine to all of the farmers on the system.
*1373 In the letter, Sabine agreed to pay bonuses ranging from $1.20 to $3 per acre for rice yields between 21 and 30 barrels per acre. A bonus of $1 per acre was to be paid for rice yields under 21 barrels per acre. The obvious purpose of this bonus offer was to increase crop yields and thereby increase defendant's profits.
No termination date for the incentive program is fixed in the letter. The trial court concluded from the evidence that Sabine never terminated the program, and that the agreement remained in full force through 1975. We agree. The bonus or incentive program is an accessory to the contract to provide irrigation water in return for one-fifth of the crop. In effect, the program results in a decrease in water charges for those farmers who qualify for bonuses. It remained in effect until terminated. Therefore, we affirm the judgment of the trial court ordering defendant to pay plaintiff bonus payments due him for 1973, 1974 and 1975. By stipulation, the amount of bonus payments due is $1,085.81.
There is no merit in defendant's argument that it discontinued or revoked the incentive program by failing to make bonus payments in 1973, 1974 and 1975. Several of the farmers, including plaintiff, continued to submit their requests during these years thinking that Sabine would eventually pay them. This belief is justified by Sabine's history of slow payment under the incentive plan. Therefore, the failure to make payment promptly in 1973, 1974 and 1975 cannot be considered an implied revocation of the incentive offer.

PLAINTIFF'S ANSWER TO THE APPEAL
Plaintiff answered the appeal seeking an increase in the amount of damages. However, he has made no argument to support an increase. On the contrary, plaintiff has attached to his brief an appendix in which he has recalculated the damages using the trial judge's method, which we have approved, and these calculations show that due to errors of computation the award should be decreased by $619.60. Therefore, we will amend the judgment so as to decrease the award by $619.60.

DECREE
For the reasons assigned, the judgment appealed is amended so as to reduce the award for damages from the sum of $23,852.47 to the sum of $23,232.87. Otherwise, the judgment is affirmed. All costs of this appeal are assessed against the defendant.
AFFIRMED, AS AMENDED.
STOKER, J., concurs in the result.
NOTES
[1] In his argument before this Court, plaintiff abandoned any claim he may have had to the one-sixth due to the landowner as rent.